**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ALFONSO MARTINEZ,

       Petitioner,

                                   CASE NO. 2:08-CV-10229

v.                                    HONORABLE VICTORIA A. ROBERTS
                                      UNITED STATES DISTRICT JUDGE

DEBRA SCUTT, Warden,

       Respondent.

_____/

**OPINION & ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND**
**DENYING CERTIFICATE OF APPEALABILITY**

       Alfonso Martinez, ("Petitioner"), is confined at the G. Robert Cotton Correctional

Facility. He serves a mandatory life sentence.  A Saginaw Circuit Court jury convicted him

of first-degree premeditated murder.[1]  He now seeks a writ of habeas corpus pursuant to

28 U.S.C. § 2254.  For the reasons stated below, his writ application is **DENIED.**

**I. Background**

       This case arises out of the fatal beating of Petitioner's wife, Latisha Martinez.

Latisha's body was found in the trunk of the Martinez's car on October 10, 2001. Petitioner

was charged with her murder.

       On the eve of trial, the trial court granted a one-day continuance at the request of

---

[1]

The proper respondent in a habeas case is the habeas petitioner's current custodian, which
in the case of an incarcerated habeas petitioner is the warden of the facility where he is
incarcerated. *See Edwards v. Johns,* 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006); *See also*
Rule 2(a), 28 U.S.C. § 2254.  Therefore, the Court substitutes Warden Debra Scutt in the
caption.

defense counsel who wanted to interview two of the Martinez's children who had recently made statements.  The next day, defense counsel informed the court that he had an opportunity to interview the two children.  He noted that Petitioner's son, Alfonso Jr., had indicated that he had a memory of his father choking his mother on the date of her death. Defense counsel argued that this testimony was the unreliable product of Alfonso Jr.'s therapy, and he requested another continuance to meet with the therapist.  Defense counsel also objected to testimony from a newly endorsed witness because he wanted time to check for telephone records regarding a phone call the witness claimed to have had with Petitioner.  The trial court denied the motion for an additional continuance.  The trial court allowed the defense to add Kelly Swartz - the social worker present during the interview of the children - to its witness list, and it indicated that it would allow the defense to call Linda Moten - Alfonso's Jr.'s therapist - as a witness.

Defense counsel also objected to the presentation of prior-bad-acts evidence regarding Petitioner's earlier conduct with the victim, based on insufficient notice. The prosecutor responded that he had made defense counsel aware of the statement by the victim's mother and  that defense counsel had been provided a copy of the witness' statement.  The trial court ruled that it would allow the other acts testimony.  The trial court also agreed that the defense would be allowed to bring in statements or evidence about the marital problems, including allegations that the victim was having an extramarital affair.

The trial evidence revealed that in the summer and early fall of 2001, Petitioner and his wife lived on Bradley Street in the City of Saginaw.  They were having marital problems, and Latisha and the their four children, Alexandra (age 14 at trial), Erica 12, Alfonso Jr. 7,

2

and Cecelia 6, moved in with her parents, the Rocha's, in September of 2001.

During this time, Petitioner came over to his mother-in-law's house a few times. During one visit, Latisha went outside to talk with Petitioner after he kept pounding on the door. Latisha's mother, who was inside, heard her daughter screaming. She looked outside and saw Petitioner beating and kicking Latisha. Latisha's mother and the oldest daughter ran outside and asked him to stop. Petitioner pushed Alexandra away when she tried to stop him, and he left before the police arrived. Latisha was not seeing any other men while she lived with her mother, although Petitioner accused her of having an affair.

Four or five days before the victim was killed, her cousin Isaac Garza, who was friendly with Petitioner, received a telephone call from him. Petitioner asked Garza questions about Latisha and whether she was having an affair. Petitioner told Garza that he was going "to smoke" his wife, "f-- that bitch up," and "get her ass."

Latisha and the children moved in with a friend, Terry Valasquez. Petitioner discovered this a day or two before Latisha was killed. A few days before her death, Ms. Valasquez saw Petitioner pull up to her house in his van. She asked him to leave. Instead, he got Latisha and forced her into his van. When Ms. Valasquez returned home, Latisha and the kids were gone. She spoke with Latisha the next day on the phone.

On October 8, 2001, Latisha's mother received a call from Petitioner asking her to bring some soup over to the house. She was reluctant, but Petitioner said he would let the oldest daughter spend the night with her. Mrs. Rocha agreed to bring the food, and she arrived with her husband at the Bradley Street home about 9 p.m. Petitioner wore black shoes, a t-shirt and a pair of cream or tan colored jeans. The kids were awake when she

arrived.  As Petitioner and some of the kids ate the soup, Mrs. Rocha had a chance to speak briefly with Latisha, who indicated she did not want to be there.  Latisha planned to start a new job at a grocery store the next day. Mrs. Rocha and her husband left with the oldest child, Alexandria, at about 10:30 p.m.  Alexandria thought that her father was wearing a black shirt with light blue jeans at that time.  Erica testified that when she went to bed that night, Petitioner told her not to come out of her room.  When she woke up in the morning, her parents were gone and her grandmother was there.

At 1:30 or 2 a.m. on October 9th, Petitioner called his own mother and asked her to come and take the kids to school in the morning.  He told his mother he was going to put job applications in and that his wife would be starting a new job.  A neighbor, who lived across the street from the Martinez residence, noted that at about 2:30 a.m. on the 9th, he heard Defendant's GMC van – and its notably loud exhaust – start up and leave.  The neighbor looked out the window and saw that the mercury light in the Martinez's driveway had been turned off.  He never heard the van return.

 When Petitioner's mother arrived later that morning, the door was open and the children were home alone and still in bed.  She took the older children to school and stayed at the house to watch Cecelia.  The victim's mother arrived at the house later that morning.  Petitioner's mother was pacing back and forth.  She was nervous and told Mrs. Rocha that she thought Petitioner must have done something to Latisha.

That same day, one of Petitioner's neighbors went to move his trash cans closer to his house.  He noticed a pair of black boots in the trash can and then found a pair of bloody light colored pants and a black shirt in the can.  He gave the items to a police officer.

4

Various relatives of Petitioner identified the boots and clothing, as belonging to Petitioner and worn by him on October 8th.

Juan Gonzalez, the victim's brother, could not be located to testify at trial. But, during the preliminary examination, he testified that on October 9th, he received a call from Petitioner. Petitioner told Juan that he messed up, f---- up, and wanted to kill himself. The preliminary examination testimony was admitted at trial. Latisha's cousin, Abraham Rosales, testified that he received a telephone call from Petitioner. Petitioner told Rosales that he had an argument with Latisha in the kitchen and had choked her. Petitioner told him that he did not know whether Latisha was dead, and he asked Rosales to tell the family he was sorry. Petitioner told Rosales that he was "two states from Pennsylvania" and that he was going to kill himself.

On October 10th, a police officer spotted the Martinez's white Oldsmobile backed into a space in a parking lot that was within walking distance of the Bradley Street residence. The officer reported his finding and stayed with the car until other officers arrived. Latisha was discovered in the trunk, covered by the comforter her mother had seen on the victim's couch on October 8th.

State police crime laboratory investigators arrived at the residence on October 10th. Spots of blood were found in the sidewalk and driveway and samples were taken. Blood stains on the living room carpet, as well as a  mark of blood in the kitchen, were also detected. A stain in the kitchen appeared as if it had been cleaned up. The expert who took samples at the scene opined that something had occurred in the living room. Blood stains were also discovered on the hood, trunk, and bumper of the car.

5

Dr. Virani, the forensic pathologist who conducted the autopsy on the victim, opined that Latisha's death was caused by blunt force head and neck trauma. He explained that this conclusion was based upon his findings of internal bleeding in various areas of the brain, as well as outside and inside injuries to the neck and chest areas. There was evidence of multiple blows, as well as evidence of choking and pressure in the area of the victim's neck. The blunt force injuries were consistent with being struck by a fist, hands, foot, or some type of object. Dr. Virani estimated the time of death to be in the morning hours of October 9th. Photographs of scrapes on the victim's arm and elbow revealed that the victim's body was dragged near or after death. Doctor Virani explained that the photographs helped him to describe the nature and extent of the injuries as well as the cause of death. Over defense counsel's objections, the trial court admitted the photographs into evidence.

DNA analysis on some of the items revealed: (1) a match to the victim for the blood stain found on the sidewalk at the Martinez residence; (2) a match to Petitioner on a sample from a tag on the tan jeans found in the garbage; (3) a match to the victim for the two bloodstains found on the tan jeans; and (4) a match to the victim for bloodstains that were found on the shirt that the victim was wearing.

Petitioner reappeared on October 14th, when he walked into his mother's house. He asked her where his wife and kids were. When his mother told him that Latisha had been murdered, Petitioner fell to his knees and cried. Petitioner's mother had her other son drive Petitioner to the police station.

On October 23rd, jail inmate Jack Stockford wrote a letter to the prosecutor about

admissions Petitioner had made to him while in jail.  Stockford, who negotiated a plea deal for himself, testified that he and Petitioner had been in the same cell at the Saginaw County jail.  Petitioner told Stockford that he wished he had killed his wife someplace else, that he was doing drugs that day, and that he had used water and bleach to clean up.

Petitioner's van was located on November 26, 2001 in the parking lot of a Ramada Inn in Indianapolis, Indiana - not far from the airport.  An airline ticket in Petitioner's name, for a flight from Indianapolis to San Antonio for 8:38a.m. on October 9th, was admitted into evidence.  Greyhound records showed that Petitioner took a bus from Houston to Flint on October 12, 2001.

Just days before the trial was to begin, Alfonso Jr., also known as "Pa," revealed to his uncle that he had seen his father choking his mother on the last night he saw his mother.  Alfonso Jr. was in first grade at the time of trial.  He was interviewed before trial by the prosecutor and by defense counsel.  Alfonso Jr. testified at trial that he woke up on that last night he saw his mother. As he walked to the bathroom he saw his father push his mother who was on the couch.  Petitioner then put his hands around her neck and choked her.  She was kicking him but he kept choking her until she "faded."  He then saw Petitioner take her out the back door, and as he looked out a window, he saw his father putting her into the trunk of the white car.  Alfonso Jr. did not tell anyone about what he saw for a long time because he was scared.  Alfonso Jr.'s older sisters testified that he told them that he had seen their parents fighting with swords.  Jesse Martinez, the victim's sister, testified that Alfonso Jr. recently told him about what he saw.  Jesse claimed that he had not talked about his sister's murder around the children.

7

Petitioner testified in his own defense.  He claimed that he was a drug-dealer, and that on October 9th  he traveled to Texas to purchase a half-kilo of cocaine.  When he returned home he was surprised to find that his wife had been murdered.  He denied that they had been fighting on the night of her death.

Later during the trial, and contrary to the advice of defense counsel, Petitioner asked to recall Alfonso, Jr.  The prosecutor objected, but the trial court initially indicated it would allow it. Later that day, the prosecutor renewed the objection with the concurrence of Alfonso Jr.'s guardian ad litem.  The guardian explained that he had assisted in preparing the child to testify initially, sat through his trial testimony, and saw him afterward.  He opined that the boy was traumatized by the trial experience and requested that he not be recalled for additional questioning.   The guardian explained that he did not believe Alphonso Jr. could add any new information and felt the recall would be done "to really torture this child." Defense counsel stated that Petitioner wanted to bring out certain details from the witness to show that the child's recollection was imperfect.  Defense counsel produced written questions that would be asked of the witness.  The trial court reviewed the questions in-camera.  The trial court found that most of the questions were collateral or irrelevant and noted that most had been dealt with indirectly or obliquely in cross-examination.  The court also noted that an opportunity already had been provided to ask the questions during cross-examination. The motion to recall the witness was denied.

The jury convicted Petitioner of first-degree premeditated murder, and the court sentenced him to mandatory life in prison.

Appellate counsel filed a motion for new trial.  The trial court denied the motion after

oral argument.  Petitioner then filed a claim of appeal with the Michigan Court of Appeals,

raising the following claims:

> I. Appellant's right to present a defense was violated when the trial court refused to grant a sufficient continuance to allow time to prepare for his children's change in testimony.
>
> II. Insufficient evidence was presented at trial to sustain Appellant's conviction.
>
> III. The admission of gruesome autopsy photographs rendered Appellant's trial unfair.
>
> IV. Appellant's right to confrontation was violated when the trial court refused to allow him to recall his son to the witness stand for further cross-examination.
>
> V. The prosecutor committed misconduct by offering improper evidence at trial and engaging in improper closing arguments.
>
> VI. The cumulative effect of these errors rendered Appellant's trial unfair.

The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished

opinion.  *People v. Martinez*, 2005 Mich. App. LEXIS 985 (Mich. Ct. App. Apr. 19, 2005).

Petitioner filed an application for leave to appeal with the Michigan Supreme Court raising

the same claims.  The Michigan Supreme Court denied Petitioner's application for leave

to appeal; it was not persuaded that the questions presented should be reviewed.  *People*

*v. Martinez*, 474 Mich. 972, 707 N.W.2d 201 (2005).

Petitioner then filed a motion for relief from judgment in the trial court, alleging that

the evidence found in the car was illegally seized in violation of his Fourth Amendment

rights.  He also raised ineffective assistance of trial and appellate counsel.  On February

12, 2007, the trial court denied this motion, finding that Petitioner had not demonstrated

good cause under Michigan Court Rule 6.508(D)(3) because his appellate counsel was not

9

ineffective for failing to have raised the issues during Petitioner's appeal of right.

Petitioner filed a delayed application for leave to appeal with the Michigan Court of

Appeals, raising the following claims:

> I. The police illegally searched and seized evidence from Appellant's automobile in violation of the Fourth Amendment, and the prosecutor failed to establish a chain of custody for evidence turned over to the police by the victim's mother.
>
> II. Appellant was denied the effective assistance of trial counsel. Counsel failed to raise the Fourth Amendment issue, failed to call a witness to challenge the credibility of the jail-house informant, failed to call a child-psychologist as a defense witness, and failed to obtain telephone records to impeach another prosecution witness.
>
> III. Appellant was denied the effective assistance of appellate counsel. Appellate counsel failed to raise the above claims during Appellant's appeal of right.

The Michigan Court of Appeals denied this delayed application "for failure to meet

the burden of establishing entitlement to relief under MICH. CT. RULE 6.508(D)." *People v.*

*Martinez*, No. 276608 (Mich. Ct. App. July 26, 2007). Petitioner then filed an application

for leave to appeal with the Michigan Supreme Court. The Michigan Supreme Court denied

Petitioner's application with citation to the same court rule. *People v. Martinez*, 480 Mich.

956, 741 N.W.2d 349 (2007).

Petitioner now raises the following claims in his petition for a writ of habeas

corpus:

> A. Petitioner's right to present a defense was violated when the trial court refused to grant a sufficient continuance to allow time to prepare for his children's change in testimony.
>
> B. Insufficient evidence was presented at trial to sustain Petitioner's conviction.
>
> C. The admission of gruesome autopsy photographs rendered Petitioner's

10

trial unfair.

D.  Petitioner's right to confrontation was violated when the trial court refused to allow him to recall his son to the witness stand for further cross-examination.

E.  The prosecutor committed misconduct by offering improper evidence at trial and engaging in improper closing arguments.

F.  The cumulative effect of these errors rendered Petitioner's trial unfair.

G.  The police illegally searched and seized evidence from Petitioner's automobile in violation of the Fourth Amendment, and the prosecutor failed to establish a chain of custody for evidence turned over to the police by the victim's mother.

H.  Petitioner was denied the effective assistance of trial and appellate counsel.  Counsel failed to raise the Fourth Amendment issue, failed to call a witness to challenge the credibility of the jail-house informant, failed to call a child-psychologist as a defense witness, and failed to obtain telephone records to impeach another prosecution witness.

I.  Petitioner has demonstrated cause and prejudice to excuse his procedural default of failing to raise claims G and H during his appeal of right.

## II.  Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state

court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).  "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, No. 2011 WL 148587, * 11 (U.S. 2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could

12

disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. 770.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims previously rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

### III. <u>Discussion</u>

### A. Denial of Continuance

Petitioner's first claim is that he was given inadequate time to prepare to cross-examine his children Alphonso Jr. and Erica at trial. Petitioner says that these two witnesses dramatically changed their statements just prior to trial, and that his counsel required more time to prepare for the new allegations. In particular, Petitioner notes that shortly before trial, Alphonso Jr. claimed for the first time that he saw Petitioner strangle the victim and put her body into the trunk of the car. Petitioner asserts that his counsel

13

required more than the one day granted by the trial court to interview Alphonso Jr.'s therapist and to investigate the possibility of retaining an expert witness. Petitioner further speculates that the mother of the victim may have influenced the children to change their testimony. Respondent argues that the state courts reasonably adjudicated the claim.

The Supreme Court has not specifically set forth a standard to determine when a failure to grant a continuance constitutes a denial of the right to present a meaningful defense. The Court has noted that the grant or denial of a motion for a continuance is within the sound discretion of the trial judge, and is be reviewed only for an abuse of that discretion. *See Avery v. Alabama*, 308 U.S. 444, 446 (1940). The Court has also explained that "[i]t would take an extreme case to make the action of the trial court in such a case a denial of due process of law." *Franklin v. South Carolin*a, 218 U.S. 161, 168 (1910). "The matter of a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

At the same time, however, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Id.* In short, "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (*quoting Ungar*, 376 U.S. at 589). Importantly, denial of a continuance amounts to a due  process violation warranting habeas relief only where the petitioner shows that he was prejudiced by the omission of the evidence he would have

14

procured had the continuance been granted. *See Mackey v. Dutton*, 217 F.3d 399, 408 (6th Cir. 2000).

The Michigan Court of Appeals rejected Petitioner's claim on the merits as follows:

Defendant argues that the trial court erred in denying his request for a second continuance before the start of trial. He maintains that a continuance was necessary to enable him to investigate recent allegations that some of his children may have witnessed him assaulting the victim on the night she was killed, and allegations that he committed other violent acts toward the victim before her death.

The preliminary examination was conducted on November 30, 2001. Approximately eighteen months later, trial was scheduled to begin on April 1, 2003. Throughout this time, the victim's three youngest children maintained that they were asleep when the victim was beaten and killed. Three days before trial was due to begin, however, the prosecutor received information that defendant's son had told others that he woke up and saw defendant strangle the victim. In addition, one of defendant's daughters told a cousin that she was awake during the assault. At the same time, the prosecutor learned of information about defendant's past abusive behavior toward the victim from Teresa Valasquez, with whom the victim and the children had lived for a period shortly before she was killed.

The prosecutor learned of this new evidence on the Friday before trial. The prosecutor interviewed Valasquez, notified defense counsel, and provided him a transcript of the interview. On April 1, 2003, after being informed of this new evidence, defense counsel requested a continuance so that he could interview and observe the children. Counsel also acknowledged that the prosecutor had provided the new information from Valasquez and wanted to review the transcript of her interview. Counsel stated that he anticipated he could begin selecting a jury the next morning. The trial court agreed to continue the matter until the next day.

On April 2, 2003, defense counsel stated that he had met with the children. He then requested a second continuance in order to meet with the children's therapist and to further investigate Valasquez's proposed testimony. Defense counsel also complained that he had not received notice of the intent to offer the prior acts testimony and moved that it be excluded. The prosecutor responded that he had provided notice of the substance of prior acts testimony from Susan Rocha, the victim's mother, and provided counsel with a copy of Valasquez's recent statement concerning defendant's abusive conduct toward the victim on the day before she was killed. The trial court denied his request for another continuance.

Defendant contends that the trial court abused its discretion in denying his second request for a continuance.  We review a trial court's decision to grant or deny a continuance for an abuse of discretion. *People v. Jackson*, 467 Mich. 272, 276; 650 N.W.2d 665 (2002).  In determining whether a trial court abused its discretion in denying a criminal defendant's request for a continuance, we consider the following factors: (1) whether the defendant was asserting a constitutional right; (2) whether the defendant had a legitimate reason for asserting that right; (3) whether the defendant was negligent in asserting it; (4) whether there were prior adjournments of trial at the defendant's request; and (5) whether the defendant has demonstrated prejudice from the trial court's abuse of discretion. *People v. Pena*, 224 Mich. App. 650, 660-661; 569 N.W.2d 871 (1997), modified in part on other grounds 457 Mich. 885 (1998).

In the instant case, the trial court granted defendant's initial request for a continuance.  Defendant has failed to demonstrate that a second continuance was necessary or that he was prejudiced by the trial court's decision.  Defense counsel requested a second continuance so that he could interview the therapist of defendant's son before he testified.  However, the child was not scheduled to testify until April 4, thereby giving counsel adequate time to interview the therapist before the child testified.  Further, the prosecutor indicated that counsel could renew his request for a continuance after interviewing the therapist if he still believed that a continuance was necessary.  Defense counsel never moved for a further continuance.  Under these circumstances, defendant has not shown that the trial court abused its discretion in denying his request for a continuance.

We also reject defendant's claim that he was prejudiced by the trial court's decision. Although defendant maintains that he was unable to investigate the prior acts evidence and the children's testimony, he does not explain how he would have proceeded differently had a continuance been granted.  Defendant also disregards the fact that he had the opportunity to investigate the evidence during the two-week trial.

Defendant further asserts that he was prejudiced by the late disclosure of the prior acts evidence, but he has not demonstrated that he is entitled to relief.  Defendant acknowledged that the prosecutor did not purposefully withhold the newly discovered evidence, and the trial court correctly found that the evidence was admissible under Michigan Rule of Evidence 404(b) to show both malice and motive. *People v. Morris*, 139 Mich. App. 550, 557; 362 N.W.2d 830 (1984); *People v. McClure*, 29 Mich. App. 361, 370; 185 N.W.2d 426 (1971).  Indeed, even when the notice requirement of Rule 404(b) is not satisfied, reversal is not required where, as here, the evidence was relevant and admissible under Rule 404(b), and the defendant had actual notice of the evidence sufficient to prepare a defense. *People v.*

16

> *Hawkins*, 245 Mich. App. 439, 453-456; 628 N.W.2d 105 (2001).  Moreover,
> the evidence concerned defendant's past abusive conduct toward the victim,
> so defendant cannot claim that the evidence surprised him.  We therefore
> reject this claim of error.

*Martinez*, *supra,* at *3-7.

This decision was not objectively unreasonable.  The trial court did not act arbitrarily in denying the second continuance, nor did its decision reflect "a myopic insistence upon expeditiousness in the face of a justifiable request for delay." *Ungar*, *supra.*  The trial court gave Petitioner's counsel an extra day to conduct any interviews with the children, and because the children witnesses were not called until later in the trial, he was afforded additional time to prepare for their new statements.  The court also allowed defense counsel to add Alphonso Jr.'s therapist to its witness list.  The cross-examination of the children reveal that counsel was well-prepared to confront their new statements.  Alphonso Jr.'s direct examination testimony was quite short, and he appeared to be a very reluctant witness.   Defense counsel was obviously familiar with Alphonso Jr.'s claims, and questioned him about details of his observations and challenged him on his sisters' claims that he said he saw his parents fighting with swords.  Erica's direct examination testimony did not include any suggestion that she witnessed the murder.  She testified that she came out of the room to complain about Alphonso Jr. a few times, but was sent back to her room by Petitioner.

Counsel also had an opportunity to challenge the victim's mother on whether she coached the children or affected their testimony. He brought out during cross-examination of the victim's mother that the children had been living with her for more than a year after the incident, that the family spoke about the murder, and that Alphonso Jr. saw reports of

17

the crime on television.  The same tact was taken on cross-examination of the uncle the children lived with for the two months prior to trial.  That is, the record supports the Michigan Court of Appeals' conclusion that the trial court did not abuse its discretion in denying a second continuance and that Petitioner did not demonstrate that he was prejudiced.

Because the decision of the state court was not objectively unreasonable, Petitioner is not entitled to habeas relief on this claim.

### B. Sufficiency of the Evidence

Petitioner's says there was insufficient evidence presented at trial to sustain his conviction.  He asserts that the clothing found in the garbage can does not point to his guilt because it was not found in front of the family home and was not found in Petitioner's possession.  He also asserts that Alphonso Jr.'s testimony can be discounted because it was contrary to his claim  for over two years that he did not see anything on the night of the murder.  Petitioner also asserts that the evidence of marital discord was insufficient to demonstrate a motive for the crime.  Petitioner likewise asks the Court to discount the testimony of the jail-house informant because it is unreliable.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  The standard of review for a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  In the habeas context, "[t]he *Jackson* standard

18

must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (*quoting Jackson*, 443 U.S. at 324 n. 16).  "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajty*s, 319 F.3d 780, 788 (6th Cir. 2003) (*citing Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).  Accordingly, "[t]he mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." *Matthews*, 319 F.3d at 788-89.

Under Michigan law, first-degree premeditated murder requires proof that the defendant intentionally killed the victim and that the killing was premeditated and deliberate. *See People v. Kelly*, 231 Mich. App. 627, 642, 588 N.W.2d 480 (1998); MICH. COMP. LAWS 750.316. Premeditation and deliberation may be established by evidence showing: "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Schollaert*, 194 Mich. App. 158, 170, 486 N.W.2d 312 (1992); *see also People v. Abraham*, 234 Mich. App. 640, 656, 599 N.W.2d 736 (1999).  Additionally, the prosecution must prove beyond a reasonable doubt that the defendant committed the charged offense. *See, e.g., People v. Kern*, 6 Mich. App. 406, 409, 149 N.W.2d 216, 218 (1967).  In other words, "proof of [the] defendant's connection with the alleged offense is an indispensable element of [the prosecutor's] duty." *Id.*  Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, *see People v. Jolly*, 442 Mich. 458, 466, 502 N.W.2d 177 (1993), including the identity of the perpetrator, *see Dell v. Straub*, 194 F. Supp. 2d 629, 647 (E.D. Mich. 2002), and the defendant's intent or state of mind. *See People v. Nowack*,

19

462 Mich. 392, 402-403, 614 N.W.2d 78 (2000).

The Michigan Court of Appeals held that the prosecution presented sufficient evidence to support Petitioner's conviction beyond a reasonable doubt. The court explained:

> Defendant next argues that the prosecution failed to present sufficient evidence to prove that he killed the victim or that the killing was committed with premeditation and deliberation. We review de novo challenges to the sufficiency of the evidence in criminal trials to determine whether, in a light most favorable to the prosecutor, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v. Randolph*, 466 Mich. 532, 572; 648 N.W.2d 164 (2002). Circumstantial evidence and reasonable inferences that arise from the evidence can constitute sufficient proof of the elements of the crime, including the elements of premeditation and deliberation. *People v. Jolly*, 442 Mich. 458, 466; 502 N.W.2d 177 (1993).

> Defendant's son testified that he witnessed defendant choke the victim and place her in the trunk of her car, and the prosecutor presented evidence of a strained marital relationship between defendant and the victim shortly before the victim was killed. Several relatives testified that defendant questioned them about the victim's alleged infidelity and threatened to kill her. Additionally, a jailhouse informant testified that defendant admitted killing the victim. Defendant was also linked to clothes and other items that were stained with the victim's blood. Furthermore, evidence was presented that, immediately after the victim was killed, attempts were made to clean up the victim's blood in the house and to dispose of the victim's body and defendant's clothes, and of defendant's subsequent interstate flight. Flight, although not direct evidence of guilt, is "admissible to support an inference of 'consciousness of guilt.'" *People v. Goodin*, 257 Mich. App. 425, 432; 668 N.W.2d 392 (2003). According to the forensic examiner, the victim received multiple blows to the head and was strangled, circumstances that support an inference of premeditation. *People v. Johnson*, 460 Mich. 720, 733; 597 N.W.2d 73 (1999). Thus, viewed in a light most favorable to the prosecution, the evidence was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that defendant killed the victim with premeditation and deliberation. *People v. Abraham*, 234 Mich. App. 640, 656; 599 N.W.2d 736 (1999).

*Martinez*, *supra*, at *7-9.

This decision did not result from an unreasonable application of the established

Supreme Court standard. Indeed, the evidence of Petitioner's guilt was strong. Clothes with the victim's blood on them were recovered from a trash can near the location of the murder. Several of Petitioner's family members identified these clothes as the ones worn by Petitioner on the day before the murder. The victim's bloodstains were found in the home and scrapes on her body indicated that she had been dragged. Her body was found in the trunk of the couple's car, covered in a quilt that came from the house. The victim's young son testified that he saw the fatal encounter, and his description of the offense meshed with the physical evidence. He testified that Petitioner choked his mother while she attempted to kick him away until she "faded." Following the death, Petitioner disappeared for a number days. Two family members testified that Petitioner made oblique confessions to them on the telephone, and a jail-house informant testified that Petitioner admitted his guilt. Viewed most favorably to the prosecution, a reasonable fact-finder could have concluded Petitioner was guilty of first-degree murder beyond a reasonable doubt.

Petitioner's arguments largely miss the point because they attack the credibility of the witnesses against him and argue that this Court should accept the narrative asserted by his counsel in closing argument. But it was the function of the jury at trial, not a federal habeas court, to resolve evidentiary conflicts. *See Jackson*, 443 U.S. at 326; *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002); *Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.")

The state court decision was not objectively unreasonable, and Petitioner is not

21

entitled to habeas relief on this claim.

## C. Admission of Autopsy Photographs

Petitioner argues that his trial was rendered fundamentally unfair in violation of due process by the admission into evidence of gruesome photographs taken during the victim's autopsy. The photographs depicted: (1) the victim's skull with the face peeled back to show internal bruising, (2) the skull with the top cut-off to show injuries to the victim's brain, (3) the bottom of the skull with the brain removed to depict internal bleeding in the head, and (4) layers of skin removed from the chest and back area to depict internal bleeding.

Generally, "'[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial.'" *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005), *quoting Roe v. Baker*, 316 F.3d 557, 567 (6th Cir.2002). The Supreme Court stated that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). The term "unfair prejudice," as to a criminal defendant, refers to the capacity of some relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged. *Old Chief v. United States*, 519 U.S. 172, 180 (1977).

The photographs were introduced to help the jury understand the pathologist's testimony, and they were relevant to the issue of intent; they showed the intensity of the beating suffered by the victim. While the photographs were no doubt gruesome, the Sixth Circuit has affirmed the admission of equally, if not more gruesome, and therefore more

22

prejudicial, photographs than those at issue. *See Biros, supra*, (concluding that state court decision affirming the admission of "three photographs-depicting [the victim's] severed head, her severed head held near her torso and severed breast, and her torso with the severed head and severed breast replaced on torso," was not unreasonable application of Supreme Court precedent because the photographs refuted the petitioner's account of the victim's death); *Frazier v. Huffman*, 343 F. 3d 780, 789 (6th Cir. 2003) (denying habeas relief where multiple photographs were introduced during the coroner's testimony to illustrate the testimony and that each photograph presented a different perspective of the victim, and that the photographs illustrated the nature of the encounter that immediately preceded the victim's death); and see *Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008) (admitting photographs of murder victim's back and head in a pool of blood, and photograph of victim's entire body face down on floor did not render trial fundamentally unfair where they allowed medical examiner to show where baseball bat caused various injuries and they were probative of the attacker's intent to kill); *Kuntzel v. Black*, 774 F.2d 291, 292 (8th Cir. 1985) (affirming denial of habeas relief where trial court admitted "particularly gruesome" photographs of  a murder victim's body and body parts from an autopsy because they were "relevant and probative" in showing the condition of the deceased, the location of the wound, and the defendant's intent).

If the photographs in these other cases were properly admitted, it is difficult to characterize the result reached by the Michigan Court of Appeals here as "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington, supra.*

The Michigan Court of Appeals' resolution of this issue was not contrary to, nor an

unreasonable application of, clearly established federal law.

### D. Failure to Recall Witness

Petitioner asserts that he was denied his right to confrontation and compulsory process when the trial court prohibited him from recalling Alphonso Jr. as a witness. Petitioner contends that his attorney was too "delicate" during the initial cross-examination of his young son and that he requested his attorney to perform a more thorough cross-examination of the child to show that his testimony was the product of coaching by the victim's mother and other family members.   Respondent asserts that the state court reasonably adjudicated this claim.

The Constitution guarantees criminal defendants a meaningful opportunity to present a defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted).  Implicit in this guarantee is the right of an accused to be confronted with the witnesses against him. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986).  This right is not absolute, however, and a trial court has discretion to limit the scope of cross-examination, including setting limits on evidence it considers prejudicial, irrelevant, repetitive, or collateral. *Id.* at 679.  On habeas review, the court should consider "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." *Id.* at 684.  "[T]he inquiry is not whether the state trial court abused its discretion in disallowing Petitioner from recalling [the witness]; the inquiry is whether the state court of appeals' decision that the state trial court did not abuse its discretion in such action was contrary to or an unreasonable application of federal law. *Stewart v.*

24

*Wolfenbarger*, 468 F.3d 338, 347-348 (6th Cir. 2006).

The state appellate court found that the trial court did not abuse its discretion in denying Petitioner's request to recall Alphonso Jr.:

> Defendant next argues that the trial court deprived him of his constitutional right to present a defense when it denied his request to recall his son. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *People v. Katt*, 468 Mich. 272, 278; 662 N.W.2d 12 (2003). We also review a trial court's decision to limit cross-examination for an abuse of discretion. *People v. Sexton*, 250 Mich. App. 211, 221; 646 N.W.2d 875 (2002).
>
> We conclude that the trial court did not abuse its discretion. The record discloses that, although defendant wished to recall his son, defense counsel did not believe it was necessary. Further, the trial court reviewed defendant's list of questions that he wanted to ask his son and found that they did not raise anything new, and many dealt with wholly collateral matters. None of the questions concerned matters that could not have been explored more fully during defense counsel's initial cross-examination of the child. Furthermore, his son was a seven-year-old child whose guardian ad litem informed the trial court that he had been traumatized by the experience of testifying and would be further traumatized if he were recalled. The trial court's concern for the vulnerability of the witness was a proper consideration. *Maryland v. Craig*, 497 U.S. 836, 855-856; 110 S. Ct. 3157; 111 L. Ed. 2d 666 (1990); *People v. Pesquera*, 244 Mich. App. 305, 310; 625 N.W.2d 407 (2001).

*Martinez, supra,* at *9-10.

This decision was not objectively unreasonable. The trial court carefully examined Petitioner's request to recall his son. The trial court had defense counsel prepare a written set of questions that Petitioner wished to cover, and after reviewing them it determined that they did not involve matters that could not have been covered during the initial cross-examination. The trial court's decision to deny the recall was also based largely on the statements of the child's guardian ad litem:

> I was present prior to the testimony of all the children in this case and had the opportunity to assist them in preparing for the fact that they were

going to testify and can state that it was incredibly traumatic for them preparing to testify for the first time.  I do know Alphonso testified and I sat through his testimony, had the opportunity to see him afterwards, and he was very traumatized because of it. . . . I would ask as attorney guardian ad litem that he not be subjected to any additional questioning if it is for no new matters at all because of the possible harm and likely harm to a child for doing that.

He was very traumatized sitting in front of his father and testifying against his father, and I do not believe it would be in his best interest to do that. . . . I do not believe there is any new information that this child could possibly produce and it would purely be done to really torture this child.  I have him as a matter of child abuse and neglect in front of Judge Harrison, and this really, to me, just appears to be a continuation of abuse and neglect that has already been inflicted upon this child and would ask that the Court not put him through this again.

Tr. 4-11-2003, at 82-84.

The clearly established Supreme Court standard grants a trial court the discretion to limit cross-examination that is repetitive, abusive and harassing.  The trial court's examination of the proposed additional questions along with the guardian's representations that the child had nothing further to add to his testimony and that it would only serve to further traumatize him, lend factual support to its decision to deny Petitioner's request. Therefore, the state appellate court's finding that the trial court did not abuse its discretion in making that decision did not result in an objectively unreasonable decision.

Habeas relief is not warranted on this claim.

### E.  Prosecutorial Misconduct

Petitioner's fifth habeas claim asserts prosecutorial misconduct.  Petitioner's claim is comprised of a number of separate allegations: (1) the prosecutor's surprise use of the last-minute change in the children's testimony and the use of the prior-acts testimony; (2) the consideration that was given to the jail-house informant in exchange for his testimony;

26

(3) the prosecutor's introduction of the inflammatory autopsy photographs; (4) using the children's therapist to vouch for the children's credibility; and (5) denigrating Petitioner, arguing facts not in evidence, and shifting the burden of proof during closing argument. Respondent asserts that review of this claim is barred by Petitioner's procedural default of failing to raise these claims at trial.

### 1. Procedural Default

Federal habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *Wainwright v. Sykes*, 433 U.S. 72, 85-87(1977).  Such a procedural default occurs when a petitioner fails to comply with a state procedural rule, the rule is relied upon by the state courts, and the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005).  A procedural default may be excused where the petitioner demonstrates cause and prejudice for his failure to comply with the state procedural rule, or when a petitioner establishes that failing to review the claim would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Combs v. Coyle*, 205 F.3d 269, 274 (6th Cir. 2000).  To demonstrate that a "fundamental miscarriage of justice" would occur absent review of a petitioner's claim, the petitioner must assert a credible claim of actual innocence that is supported by reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 315-16 (1995).

In reviewing Petitioner's prosecutorial misconduct claim, the Michigan Court of Appeals stated the following:

> Defendant next argues that misconduct by the prosecutor deprived him of a fair trial.  We generally review claims of prosecutorial misconduct de novo to determine whether the defendant was denied a fair and impartial trial.

27

> *People v. Ackerman*, 257 Mich. App. 434, 448; 669 N.W.2d 818 (2003).
> Because defense counsel failed to object to the prosecutor's conduct at trial,
> we review these claims for plain error. *People v. Carines*, 460 Mich. 750,
> 763; 597 N.W.2d 130 (1999); *Ackerman, supra* at 448.  To avoid forfeiture
> under the plain error rule, defendant must establish that: (1) an error
> occurred; (2) the error was plain; (3) and the plain error affected defendant's
> substantial rights, i.e., it affected the outcome of the lower court proceedings.
> *People v. Barber*, 255 Mich. App. 288, 296; 659 N.W.2d 674 (2003), *citing
> Carines, supra* at 763.

*Martinez*, *supra*, at *12.

Petitioner's prosecutorial misconduct claim was procedurally defaulted by virtue of

his failure to object to the prosecutor's conduct in the trial court which resulted in appellate

review under the more restrictive "plain error" standard of review.  It is well-established that

the Michigan Court of Appeals' application of plain-error review constitutes the invocation

of an independent and adequate procedural rule that bars federal review of the merits of

his claim. *Fleming v. Metrish*, 556 F.3d 520, 524 (6th Cir. 2009).

Therefore, Petitioner is entitled to review of his claims on the merits only if he can

demonstrate "cause and prejudice," or that he is actually innocent.   However, when a

petitioner claims ineffective assistance of counsel as cause for a procedural default, the

allegation of ineffectiveness is a separate claim which must itself be exhausted in state

court according to the normal procedures. *Edwards v. Carpenter*, 529 U.S. 446, 452

(2000); *Murray v. Carrier*, 477 U.S. 478, 489 (1986) ("The exhaustion doctrine…generally

requires that a claim of ineffective assistance of counsel be presented to state courts

before it may be used to establish cause for a procedural default.")  According to *Edwards*,

the failure to exhaust the ineffectiveness claim will itself constitute a procedural default of

the cause argument and prevents a federal court from hearing it. 529 U.S. at 452.

Petitioner never exhausted a claim that his trial counsel was ineffective for failing to

object to the alleged instances of prosecutorial misconduct during his appeal of right. Therefore he cannot demonstrate cause to excuse his default.

Nor has Petitioner demonstrated that he is actually innocent.   In an extraordinary case, where a constitutional error has probably resulted in the conviction of one who is actually innocent, a federal court may consider the constitutional claims presented even in the absence of a showing of cause for procedural default. *Murray v. Carrier*, 477 U.S. 478, 479-80 (1986).  To be credible, such a claim of innocence requires a petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Although Petitioner protests his guilt in his petition, he does not point to any reliable evidence that was not presented at trial to support his allegation.  Petitioner claims that Alphonso Jr. has since recanted his trial testimony that he witnessed Petitioner strangle his mother and move her body into the trunk of the car. Petitioner asserts that Alphonso Jr. recanted this testimony in a phone conversation he had with him while in prison and that perhaps he did so with his therapist.  The Court allowed limited discovery for Petitioner to pursue this allegation.  The Court reviewed Alphonso Jr.'s counseling records in camera, and there is no indication at all in the records that he recanted his trial testimony.  Likewise, the Court reviewed in camera recordings of hours of phone conversations between Petitioner and various family members.  There was never a direct conversation between Petitioner and his son.  There were conversations where Petitioner requested that his mother or daughters  take his son to a notary to make a statement, but there is no suggestion that his son was willing to make a statement or that the statement would be favorable to Petitioner.

Accordingly, Petitioner's fifth claim is procedurally defaulted and Petitioner has not

demonstrated the existence of cause and prejudice or actual innocence to excuse his default. Nevertheless, even if Petitioner's claims were reviewed on the merits, he still would not be entitled to habeas relief.

### 2. Merits of the Claims

The United States Supreme Court stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

The United States Court of Appeals for the Sixth Circuit adopted a two-part test for determining whether prosecutorial misconduct violates a defendant's due process rights. *See Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing cases). First, the court must determine whether the challenged statements were indeed improper. *Id.* at 452. Upon a finding of impropriety, the court must decide whether the statements were flagrant. *Id.* Flagrancy is determined by an examination of four factors: (1) whether the statements tended to mislead the jury or prejudice the accused; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally before the jury; and (4) the total strength of the evidence against the accused. *Id.*; *see also Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006); *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000) (*citing United States v. Francis*, 170 F.3d 546, 549-50 (6th Cir. 1999)). "[T]o constitute the denial of a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial,'

30

or 'so gross as probably to prejudice the defendant.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (citations omitted).

Petitioner's first allegation of misconduct concerns the use of the children's new testimony  and prior-acts evidence.  Petitioner asserts that it was improper for the prosecutor to "ambush" him with this evidence because it came to light so close to the trial date.  But the prosecutor informed Petitioner and the trial court of its intention to use this evidence prior to trial.  Over Petitioner's objection, the trial court ruled that the prior-acts evidence was admissible.  The trial court allowed Petitioner a short adjournment to prepare for the children's testimony.  As the Sixth Circuit explained, "[a] prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings." *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008).  Accordingly, the prosecutor did not commit misconduct by introducing this evidence after receiving permission from the trial court to do so.

Petitioner next asserts that it was improper for the prosecutor to give the amount of consideration it did to the jail-house informant in exchange for his testimony.  A prosecutor is entitled to make deals with jail-house informants in exchange for their testimony, so long as the value of the deal is disclosed to the defendant. *See, Giglio v. United States*, 405 U.S. 150, 153 (1972).  There is no Supreme Court case that limits that amount of consideration that can be given in exchange for testimony.  The only prohibition is that the prosecutor may not knowingly have a witness present false testimony.  *United States v. Agur*s, 427 U.S. 97, 103 (1976).  While Petitioner claims that the jail-house informant's testimony in his case was false, Petitioner has not identified facts which show that the prosecutor knowingly presented false information.  Conclusory allegations, without

31

evidentiary support, do not provide a basis for habeas relief. *See Cross v. Stovall*, 238 F. App'x 32, 39-40 (6th Cir. 2007).

Petitioner next asserts that the prosecutor committed misconduct by seeking admission of the gruesome autopsy photographs.  "[A]rguments that encourage juror identification with crime victims are improper." *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008).  A prosecutor acts improperly when the prosecutor "calls on the jury's emotions and fears -- rather than the evidence - to decide the case." *Id.* But as noted above, defense counsel objected to the admission of the photographs, and the trial court found that they were admissible.  They were relevant to support the prosecution's theory regarding the mental state elements of the murder charges against Petitioner, and they were not used to elicit sympathy for the victim.  "The admission of relevant photographs of a crime scene or victim, even if gruesome, does not deprive a criminal defendant of a fair trial." *Skrzycki v. Lafler*, 347 F. Supp. 2d 448, 455 (E.D. Mich. 2004) (Gadola, J.).

Petitioner also claims that the prosecutor vouched for the credibility of the children's testimony.   The test for improper vouching for a witness is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility. *United States v. Causey*, 834 F. 2d 1277, 1283 (6th Cir. 1987).  "[G]enerally, improper vouching involves either blunt comments, or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *See United States v. Francis,* 170 F. 3d 546, 550 (6th Cir. 1999)(internal citations omitted); *See also Griffin v. Berghuis,* 298 F. Supp. 2d 663, 674-75 (E.D. Mich. 2004).  It is worth noting that the Sixth Circuit has never granted habeas relief for improper vouching. *Byrd v. Collins,* 209 F.3d at 537 and n. 43.  Even on

32

direct appeal from a federal conviction, the Sixth Circuit has held that to constitute reversible error, a prosecutor's alleged misconduct of arguing his personal belief, in a witness' credibility or in a defendant's guilt, must be flagrant and not isolated. *See United States v. Humphrey,* 287 F. 3d 422, 433 (6th Cir. 2002).

Numerous cases hold that a prosecutor does not engage in vouching by arguing that his witnesses have no reason or motivation to lie, when such comments are based on the evidence and do not reflect a personal belief of the prosecutor. *See United States v. Jackson,* 473 F. 3d 660, 672 (6th Cir. 2007); *U.S. v. Israel,* 133 Fed. Appx. 159, 165 (6th Cir. 2005); *U.S. v. Parker,* 49 Fed. Appx. 558, 563 (6th Cir. 2002); *See also Alder v. Burt,* 240 F. Supp. 2d 651, 669 (E.D. Mich. 2003)(prosecutor did not engage in improper vouching when he argued that there was no evidence that prosecution witness had "axe to grind" or any other improper motive, when he asked rhetorically whether person who would burn 19-year-old female's body to destroy evidence would give truthful testimony, or when he asked whether prosecution witnesses had any reason to lie).

The prosecutor did not vouch for the children. Petitioner asserts that the prosecutor used his cross-examination of the children's therapist, who was called by the defense, to vouch for the credibility of the children. However, Petitioner does not point to anywhere in the record where the prosecutor stated or implied any secret knowledge that the children testified truthfully. The prosecutor cross-examined the therapist on matters broached by defense counsel during direct examination. Defense counsel attempted to show through the therapist's testimony that Alphonso's testimony was suspect, and the prosecutor merely attempted to counter that suggestion. There was no improper vouching.

Lastly, Petitioner asserts that prosecutor used impermissible tactics during his

closing argument by denigrating the defense, arguing facts not in evidence, and shifting the burden of proof.

The record does not support this claim. Although prosecutorial attacks on the credibility or motives of defense counsel are not permitted, the prosecutor does have the right to comment on a defense counsel's argument during summation. *Mickens v. United States*, 53 F. Supp. 2d 326, 332 (E.D.N.Y. 1999). Here, the prosecutor characterized the defense as setting up a smoke-screen and attempting to lead the jury astray. But these comments were not improper; when viewed in context, they attacked defense counsel's arguments, not defense counsel personally. *See United States v. Xiong,* 262 F. 3d 672, 675 (7th Cir. 2001); *United States v. McCarter,* 307 F. Supp. 2d 991, 996 (N.D. Ill. 2004). Petitioner asserts that the prosecutor argued facts not in evidence by stating that the murder was not the result of a robbery. The prosecutor's reference to jewelry found on the victim's body was supported by reasonable inferences that could be drawn from the autopsy photographs, which apparently showed that the victim's body had jewelry on it. Nor did any of the prosecutor's argument "shift the burden of proof," as argued by Petitioner. The jury was properly instructed that the prosecutor carried the burden of proof beyond a reasonable doubt. Juror's are presumed to follow their instructions, and nothing stated by the prosecutor during closing arguments overcomes that presumption in this case. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Accordingly, even if Petitioner's prosecutorial misconduct claim were not subject to procedural default, it still would not provide a basis for habeas relief because the claim is without merit.

**F. Cumulative Error**

34

Petitioner's sixth claim asserts that the cumulative effect of the above-described claims rendered his trial fundamentally unfair in violation of due process.  Petitioner cites *Kyles v. Whitley*, 514 U.S. 419 (1995), as standing for the proposition that individual errors may accumulate to give rise to an error of constitutional dimension.

Cumulative error claims are not cognizable in habeas corpus actions because they cannot be supported by clearly established Supreme Court law as required by AEDPA. *Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006);  *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005).  This Court is bound by these precedents, notwithstanding Petitioner's interpretation of *Kyles*.  *Kyles* involved the cumulative effect of suppressed evidence favorable to the defense rising to a "material" level of importance. 514 U.S. at 437-38.  The rule is inapposite to the situation here where Petitioner argues that several distinct errors that by themselves may not entitle him to habeas relief can accumulate to create an error of constitutional dimension.  The claim does not provide a basis for granting habeas relief.

### G.  Illegal Search and Seizure

Petitioner's seventh claim asserts that the search of his car, containing the victim's body and other incriminating evidence, was illegal under the Fourth Amendment.  A portion of his eighth claim asserts that his trial and appellate counsel were ineffective for failing to pursue this issue at trial and during his appeal of right.  Respondent asserts that review of the claims is barred by *Stone v. Powell*, 428 U.S. 465 (1976), and by Petitioner's procedural default for failing to raise the issue at trial or on direct appeal.

The Fourth Amendment claim, standing alone, is not cognizable.  The Supreme Court holds that "where the State has provided an opportunity for full and fair litigation of

35

a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." *Id.*, 428 U.S. at 494-95.  The Sixth Circuit Court of Appeals utilizes a two-step analysis to determine whether a defendant was given a full and fair opportunity to litigate a Fourth Amendment claim in state court: "First, the court must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim. Second, the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism."
*Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000) (internal quotations omitted).

"Michigan has a procedural mechanism which presents an adequate opportunity for a criminal defendant to raise a Fourth Amendment claim." *Robinson v. Jackson*, 366 F.Supp.2d 524, 527 (E.D. Mich. 2005). This procedural mechanism is a motion to suppress, ordinarily filed before trial. *See People v. Ferguson*, 376 Mich. 90, 135 N.W.2d 357, 358-59 (1965) (describing the availability of a pre-trial motion to suppress).  Because Michigan provides a procedural mechanism for raising a Fourth Amendment claim, Petitioner may only demonstrate entitlement to relief if he establishes that presentation of his claim was frustrated by a failure of that mechanism.  There is no indication that the state court would have been unwilling to address Petitioner's Fourth Amendment challenge had it been made.  Petitioner was provided an opportunity for full and fair litigation of his Fourth Amendment claim in the Michigan courts.  Therefore, Petitioner's Fourth Amendment claim is barred by the rule in *Stone v. Powell*.

Next, while Petitioner's related ineffective assistance of trial counsel claim is not barred by this rule, Respondent asserts that it is barred by Petitioner's procedural default

36

of failing to raise the claim during his direct appeal.  Petitioner presented this claim to the state courts in his motion for relief from judgment.  The Michigan Supreme Court denied relief pursuant to Michigan Court Rule 6.508(D), which provides, in part, that a court may not grant relief to a defendant if the motion for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good cause for the failure to raise such grounds, previously and actual, resulting prejudice. See Mich. Ct. R. 6.508(D)(3).  The  Sixth Circuit recently held that the form order used by the Michigan Supreme Court to deny leave to appeal in this case is unexplained because its citation to Michigan Court Rule 6.508(D) is ambiguous as to whether it refers to a procedural default or a rejection on the merits. *See Guilmette v. Howes*, 624 F.3d 286, 291-92 (6th Cir. 2010) (en banc).  Consequently, under *Guilmette*, the Court must "look through" the unexplained order of the Michigan Supreme Court to the state trial court's decision to determine the basis for the denial of state post-conviction relief.

The state trial court here denied relief on procedural grounds.  The trial court cited Michigan Court Rule 6.508(D)(3) and concluded that Petitioner: (1) had not shown cause, i.e., that appellate counsel was ineffective, or prejudice because his underlying claims lacked merit, and (2) had not demonstrated actual innocence.  Accordingly, these claims are procedurally defaulted.

As stated above, a state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 753.

Petitioner asserts that ineffective assistance of appellate counsel constitutes cause

to excuse the procedural default of this claim[2].  Petitioner has not shown that appellate counsel was ineffective.  In order to establish ineffective assistance of appellate counsel, Petitioner must show "that counsel's performance was deficient . . . [and] that the deficient performance prejudiced the defense." *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).

It is well-established  that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).  The Supreme Court explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the ... goal of vigorous and effective advocacy .... Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* at 754.

Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *See Smith v. Murray*, 477 U.S. 527, 536 (1986) (*quoting Barnes*, 463 U.S. at 751-52).  "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v.*

---

[2]

The Court interprets Petitioner's ninth listed habeas claim as asserting a "cause and prejudice" argument to excuse the procedural default of his seventh and eighth habeas claims.  It does not appear that Petitioner's ineffective assistance of appellate counsel claim is being asserted as a separate substantive claim in which Petitioner is seeking a new appeal of right.

38

*Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).   Appellate   counsel may deliver deficient

performance and prejudice a defendant by omitting a "dead-bang winner," defined as an

issue which was obvious from the trial record and would have resulted in reversal on

appeal. *See Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Petitioner fails to show that by omitting the claim that his trial counsel was ineffective

for failing to raise the Fourth Amendment claim in the trial court, appellate counsel's

performance fell outside the wide range of professionally competent assistance.   Appellate

counsel presented legitimate and viable issues during direct appeal.   Indeed, Petitioner

raises those same issues in his petition and claims that they entitle him to habeas relief.

Petitioner has not shown that appellate counsel's strategy in presenting those claims and

not raising the claims contained in the motion for relief from judgment was deficient or

unreasonable.   Petitioner has thus failed to demonstrate that appellate counsel was

ineffective, and fails to establish cause to excuse his procedural default.

In any event, the omitted claim is not clearly stronger than the issues that appellate

counsel did raise.   Petitioner asserts that the search of the Oldsmobile where his wife's

body was discovered was illegal because the car was not found parked at the family's

residence.   The search warrant, attached by Petitioner to his habeas petition states that the

search may include ". . . a white 1990 Oldsmobile, four door, RHJ332 registered to Litisha

M. Martinez at 604 Bradley."   Contrary to Petitioner's strained interpretation of the warrant,

it did not state that the search of the car would be permitted only if it were found at the

Bradley address.   Petitioner further argues that some of the facts contained in the affidavit

for the search warrant were false.   Specifically, he states that the statement by Juan

Gonzalez that Petitioner told him that he "[messed] up," was not supported by the trial

evidence.  But even if this were true, as outlined in the statement of facts above, there was ample evidence to support a search warrant besides this statement.

Lastly, Petitioner asserts that there was a break in the chain of custody of the evidence turned-over to the police by the mother of the victim.  He asserts that there was no corroboration that the items were in fact discovered at the house.  There is no such requirement.  *See United States v. Jacobsen*, 466 U.S. 109, 113-114 (1984).

Accordingly, Petitioner's Fourth Amendment claim is barred by the rule in *Stone v. Powell*, and his related ineffective assistance of counsel claim is barred by his procedural default of failing to raise the claim during his appeal of right. Petitioner has not demonstrated cause to excuse the default, not has he established that a fundamental miscarriage of justice has occurred.

These claims do not warrant federal habeas relief.

### H.  Ineffective Assistance of Counsel

The remainder of Petitioner's eighth claim asserts a number of allegations of ineffective assistance of counsel.  Petitioner's pro se petition develops two allegations of ineffective assistance of trial counsel: (1) the failure to raise the Fourth Amendment issue already discussed and decided above; and (2) the failure to present Scott Larkin as a witness for the defense.  Petitioner's appointed habeas counsel filed a supplemental brief developing a third allegation: counsel's failure to obtain additional telephone records to impeach the testimony of Abraham Rosales.  Respondent asserts that these claims are barred by Petitioner's procedural default of failing to raise them in his appeal of right.

Respondent is correct.  These remaining claims of ineffective assistance of trial counsel are defaulted for the same reasons discussed above.  And Petitioner has not

demonstrated that his appellate counsel was ineffective for failing to raise the claims or that he is actually innocent in an effort to excuse the default.  Even setting aside the default, however, Petitioner is still not entitled to habeas relief based on these claims because they are without merit.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.*  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."*Id.* at 687.  The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction [or sentence] resulted from a breakdown in the adversary process that

41

renders the result unreliable." *Id.* at 687.

Petitioner claims that his attorney should have called Scott Larkin as a witness. Petitioner appends a letter to his petition purporting to be a pretrial correspondence to his attorney informing him that Scott Larkin was housed in jail with Jack Stockford, and that Stockford told Larkin that he lied about Petitioner's admissions to him.  Appended to the supplemental brief filed by Petitioner's habeas counsel is the affidavit of Scott Larkin.  In the affidavit, Larkin claims that he met Stockford in the Saginaw County Jail and that Stockford developed his testimony against Petitioner by reading accounts of the murder in the newspaper.  Stockford told Larkin that "he was going to make up some of his testimony," and that he would not be going back to prison as a result of his testimony against Petitioner.

Decisions as to what evidence to present and whether to call certain witnesses are presumed to be a matter of trial strategy, and the failure to call witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *See Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).  When making strategic decisions, counsel's conduct must be reasonable. *See Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *see also Wiggins*, 539 U.S. at 522-23.

Assuming that trial counsel was informed of Larkin's existence, the decision not to call him as a witness might have been the result of a reasonable tactical decision.  Counsel attacked Stockford's credibility during cross-examination.  He argued that Stockford's testimony should not be believed because of the deal he received in exchange for his testimony, the fact that Stockford saw television news reports about the murder, and

42

because of dubious details contained in his description of Petitioner's statements to him. While defense counsel might also have called Larkin to cast further doubt on Stockford's veracity, Larkin himself was a habitual offender who had committed numerous offenses involving dishonesty. Because counsel called other witnesses including Petitioner during the defense case, he may have made the reasonable tactical decision to avoid calling a witness whom the jury might have viewed as not credible. The decision not to call Larkin is precisely the type of presumptively reasonable tactical decision that falls within the wide range of professionally competent assistance.

Moreover, even if counsel performed deficiently by failing to call Larkin, he has not demonstrated the requisite prejudice. Even assuming Larkin's testimony would have destroyed Stockford's credibility, the remaining evidence presented against Petitioner would have been unaffected, and it overwhelmingly proved Petitioner's guilt. The victim was last seen alive in the living room of her home with Petitioner at night. The only other people present in the house were young children. The next morning both Petitioner and the victim were gone. The victim was found beaten and strangled to death in the trunk of the couple's car. Clothes identified as being worn by Petitioner on the day of the victim's death were found in a nearby garbage can and were stained with both the victim's and Petitioner's blood. A neighbor heard Petitioner's van leave late on the night of the murder and not return. Petitioner's son witnessed his father beating and choking the victim until she "faded" on the night in question, and he saw Petitioner place her body in the trunk of the car. This evidence, along with Petitioner's statements to family suggesting that he had done something bad and the evidence of the deteriorating marital relationship, strongly pointed to Petitioner as the perpetrator of the murder. While Stockford's testimony added

43

to the weight of the case against Petitioner, there is not a reasonable probability that the verdict would have different had his testimony been impeached by Larkin.  Accordingly, Petitioner was not prejudiced by his counsel's decision not to call Larkin as a defense witness.

Next, Petitioner claims that his counsel was ineffective for failing to obtain additional phone records to show that Petitioner did not call Abraham Rosales.  When "asking whether counsel adequately investigated his client's defense, the ultimate inquiry is whether the choice not to conduct additional investigation was 'reasonable[ ] in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (*quoting Strickland*, 466 U.S. at 691). "[C]ounsel may 'draw a line when they have good reason to think further investigation would be a waste.'" *Id.* at 288 (*quoting Rompilla v. Beard*, 545 U.S. 374, 383 (2005)).

Petitioner's trial counsel did not perform deficiently by failing to investigate whether there were additional phone records to show that Petitioner did not call Rosales.  Rosales testified that Petitioner called him and had a 15-20 minute conversation in which Petitioner made incriminating statements.  To undermine this testimony, defense counsel did use telephone records obtained by the prosecution to suggest that no such call was made.  On cross-examination of Detective Fink by defense counsel, the following exchange occurred:

> Q. For the record we have now marked the telephone records that you had been reading from as Defendant's Exhibit 97, is that correct?
>
> A. Yes.
>
> Q. And those were Ameritech records concerning incoming calls to the phone numbers that you and Peters requested as being associated with Rosales and Gonzalez?

A. Correct.

Q. These were supplied to you as being kept in the regular course of business?

A. Yes.

T 4/11/2003, p 55.

Defense counsel pointed-out that the records do not show a call lasting between 15-20 minutes on the date in question as testified to by Rosales. The record does show a twelve-minute unlisted call. The prosecutor suggested on redirect examination of Detective Fink that this unlisted entry may have been the call in question. Detective Fink testified that if Martinez used a cell-phone or if his call was answered by using the call-waiting feature, he didn't know if the records would indicate that the call came from Martinez.

Accordingly, Petitioner suggests that more detailed records might have resolved this ambiguity. The Court allowed Petitioner discovery to pursue this line, but apparently any additional records no longer exist. As it relates to deficient performance, the problem for Petitioner is that further investigation may have been harmful instead of helpful. If counsel had discovered the existence of additional records that confirmed that Petitioner called Rosales, he would have lost the ability to challenge Rosales's testimony with the fact that no 15-20 minute call was made on the date in question. That is, the incomplete records obtained by the prosecutor allowed counsel an opportunity to attack Rosales's credibility. The tactical decision not to seek further records and risk losing this argument is again the type of presumptively reasonable tactical decision that falls within the wide range of professionally competent assistance.

45

Petitioner also cannot demonstrate that he was prejudiced by his counsel's failure to obtain more detailed records. Because no such records exist, he has not and cannot show a reasonable probability that they would have been favorable at all. Moreover, for the reasons stated above, even if Rosales's testimony was discredited by additional phone records, it would not have impacted the other convincing evidence of Petitioner's guilt.

That is, Petitioner is not in prison because his attorney failed to call one jail-house informant to discredit another jail-house informant, or because he failed to obtain additional phone records. He is in prison because of the overwhelming evidence presented against him at trial. Accordingly, even if Petitioner's ineffective assistance of counsel claim was not procedurally defaulted, it would not form the basis for habeas relief.

## IV. Conclusion

The Court denies the petition for writ of habeas corpus.

The Court also denies a certificate of appealability to Petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States,* 310 F. 3d 900, 901 (6th Cir. 2002).

46

The Court denies Petitioner a Certificate of Appealability because he failed to make a substantial showing of the denial of a federal constitutional right.  Jurists of reason would not find this Court's resolution of Petitioner's claims to be debatable, or that he should receive encouragement to proceed further. *Siebert v. Jackson,* 205 F. Supp. 2d 727, 735 (E.D. Mich. 2002).

## V.   ORDER

The Petition for Writ of Habeas Corpus is **DENIED.**

Also, a Certificate of Appealability is **DENIED.**

**IT IS ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  March 29, 2011

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 29, 2011.

s/Linda Vertriest
Deputy Clerk

47